IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

PRAXIS CAPITAL, L.P., )
)
                     Plaintiff, )
)
vs. ) No. 06-3043-CV-S-FJG
)
JEREMY GARDNER, et al., )
)
                     Defendants. )

## **ORDER**

Currently pending before the Court is plaintiff's Motion for Summary Judgment (Doc. # 89), Gerald Gardner's Motion for Summary Judgment (Doc. # 91), Jeremy Gardner's Motion to Liberally Construe Pleadings and Motions (Doc. # 120); Jeremy Gardner's Motion to Accept Pleadings and Motions As Timely Filed (Doc. # 121); Gerald Gardner's Motion for Sanctions (Doc. # 123); Gerald Gardner's Combined Objections to Plaintiff's Witnesses and Exhibit Disclosures and Motion for Sanctions Pursuant to Rule 37(c) (Doc. # 124), Praxis' Motion in Limine (Doc. # 129) and Motion to Withdraw as Attorney for defendant Cutting Edge (Doc. # 133).

### I. BACKGROUND[1]

Plaintiff is a Pennsylvania Limited Partnership. Gerald "Jerry" Gardner is a

---

[1] Plaintiff filed a 113 paragraph Statement of Facts in Support of its Motion for Summary Judgment. Defendants Jeremy and Gerald Gardner did not specifically controvert the plaintiff's Statement of Facts, but instead listed in three general categories those facts that they agreed to, those they did not agree to and those facts to which they did not have enough information to either agree or disagree. Pursuant to Local Rule 56.1(a), "[a]ll facts set forth in the statement of the movant shall be deemed admitted for the purposes of summary judgment unless specifically controverted by the opposing party." Thus, the factual information referred to is taken from the plaintiff's Statement of Facts.

resident of Missouri and until December 16, 2005, was the President and sole member of Cutting Edge Fabrications, L.L.C. Jeremy Gardner is Gerald Gardner's son and was responsible for arranging the financing with Praxis. Praxis is a Factor. The company provides capital to its clients through Factoring. Praxis purchases its clients' accounts receivable in advance of their payment based on documentation provided by its clients' pursuant to a Factoring Agreement. Praxis then collects payment of those accounts receivable on behalf of its clients and after deducting its fees, remits the balance to the client. In April 2005, Cutting Edge applied to Praxis for a Factoring credit facility. In the Financing Application that was supplied to Praxis, Jerry Gardner was identified as the President of Cutting Edge with one hundred percent ownership. In May 2005, Jerry Gardner executed the proposal and returned it to Praxis. Praxis then undertook an investigation of Cutting Edge, including a credit report, analyzing financial data, reviewing tax returns, contacting Cutting Edge's principal customers, procuring credit insurance and obtaining a Dunn and Bradstreet business report.

During this investigation, the Gardners told Praxis that Jeremy Gardner would be assisting with the contract administration, accounting, invoicing and planning. However, they did not disclose that Jeremy was under investigation in Denver, Colorado for submitting false statements to multiple banks and lenders, and had been arrested and charged with felony fraud by the State of Colorado.

Based on the information supplied by the Gardners, Praxis entered into a Factoring and Security Agreement with Cutting Edge on May 10, 2005. Under this Agreement, Praxis agreed to purchase accounts receivable up to an aggregate amount of $750,000.00. Under the Agreement, Cutting Edge was to notify its customers that Praxis had acquired its accounts receivable and that all future payments were to be

made to a lockbox under Praxis' control. Additionally, Cutting Edge represented that it had the power and authority to execute, deliver and perform the Factoring Agreement, that it would not change its ownership or control, that each account represented a true, correct and undisputed statement of indebtedness to Cutting Edge and that no assigned account was subject to any dispute, defense, offset, counterclaim, allowance, deduction or contingency.

Praxis purchased and factored invoices billed by Cutting Edge based on fraudulent documents submitted by the Gardners to Praxis for seven different companies. In July 2005, Cutting Edge requested that Praxis increase the factoring facility to $1,000,000.00. From September 15, 2005 until October 14, 2005, Praxis factored five more invoices. On October 12, 2005, the Denver District Attorney's office contacted Praxis. Praxis was advised that Jeremy Gardner was being investigated for financial crimes, including fraud against another factor and for submitting false statements to banks and other financial institutions. Praxis then contacted two of the customers whose invoices Cutting Edge had submitted and learned that neither company had executed any verifications authorizing payment to Cutting Edge. After learning of this information, Praxis confronted Gardner. Jeremy admitted that many of the "contracts" did not exist and that the invoices directed to Praxis for factoring were false. Jerry Gardner also acknowledged that Jeremy had been arrested and charged with fraud and that he had been aware of the charges and in fact had earlier posted bail for Jeremy. Jerry Gardner also admitted that the 2004 tax return that had been submitted to Praxis was false and that he had not contributed $250,000.00 to Cutting Edge as he had represented. Jerry Gardner however indicated that he had not participated in the fraud and promised to work with Praxis to restructure the Factoring

3

Agreement, to complete the outstanding contracts and to ensure that Praxis was repaid. Based on Jerry Gardners' representations, Praxis entered into a First Amendment to the Factoring and Security Agreement. The Amendment provided that Cutting Edge and Jerry Gardner were ratifying all previous representations, all accounts would be considered "Assigned Accounts" and considered the sole property of Praxis, Cutting Edge would provide copies of all new billing invoices and assign the same to Praxis, they would provide copies of weekly information concerning the company's financial status and would provide information showing Cutting Edge's compliance with its tax obligations. Cutting Edge also agreed that Jeremy Gardner would not have an ownership interest in and would not participate in the operations or management of Cutting Edge or have any involvement with the company. Jerry Gardner agreed to unconditionally guarantee all of Cutting Edge's obligations to Praxis and also agreed to pledge his certificates of ownership representing 100% of the issued and outstanding membership units in Cutting Edge to Praxis.

After executing the Pledge and Amendment, Praxis discovered that two of Cutting Edge's largest customers were dissatisfied with Cutting Edge's performance and threatened to terminate the contracts. Praxis also learned that Jerry Gardner was not paying vendors promptly or withholding taxes as required. Praxis then informed Gardner that it no longer had confidence in his ability to manage Cutting Edge. Praxis introduced Gardner to Doug Thomas, an individual experienced in the steel fabrication industry as a potential partner. After several meetings, it was agreed that Gardner would transfer to Thomas, 70% of the outstanding Certificates, Gardner would continued to draw a regular salary from Cutting Edge and would also continue assisting with estimating and bidding on future jobs.

However, despite this new arrangement, Praxis determined that Jerry Gardner withdrew approximately $100,000 for the benefit of his son, Jeremy. These funds were procured directly from monies provided by Praxis, as the result of false or materially overstated invoices. After the transfer of control to Doug Thomas, Jerry Gardner continued his fraud on Praxis. Jerry Gardner misdirected the proceeds of a $32,000 check that represented payment of a factored account, he took possession of another check totaling $10,000, he authorized a substantial reduction in the amount due from a customer, he removed trusses and other material fabricated by Cutting Edge for its customers, he removed tools, machinery, and equipment belonging to Cutting Edge, he failed to issue invoices for the benefit of Cutting Edge and marked invoices as "void" in order to divert payment to himself, he overdrew a Cutting Edge bank account and diverted the proceeds for his personal benefit, and he fired employees who were loyal to Doug Thomas. Gardner also wrongfully withdrew $4,000 from Cutting Edge's bank account.

Jeremy Gardner admitted to intentionally and knowingly defrauding Praxis pursuant to a Plea Agreement in the case: People of State of Colorado v. Jeremy Gardner, Case No. 05CR4037 and No. 05CR5321. In his Plea Agreement, Jeremy Gardner acknowledged that he had to pay restitution to Praxis, along with various other companies that he had defrauded. He also agreed to stipulate to a prison term of 18 years and restitution in the amount of $2,852,148.75, plus interest at the rate of 12% per annum. Gardner represented that Praxis had factored a total of $939,145.11 Cutting Edge invoices and at least $627,346.80 were based on fraudulent invoices provided by the defendant.

## II. STANDARD

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the moving party meets this requirement, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. 242, 248 (1986). In Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), the Court emphasized that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to establish a genuine issue of fact sufficient to warrant trial. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushia, 475 U.S. 574, 588; Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985).

### III. DISCUSSION

**A. Count II - Breach of Contract**

Praxis argues that it is entitled to summary judgment on Count II against Jerry Gardner because he executed a Surety Agreement, which he then breached. The Surety Agreement provided that Jerry Gardner was:

> [u]nconditionally, absolutely, and jointly, severally, and in the alternative, with all other sureties (as such term is defined in the Integrated Agreements), guaranties as surety the punctual payment when due of any and all existing and future indebtedness and liability created, arising under, or evidenced by the Integrated Agreements given by the Company

6

> to Praxis, as well as all other obligations of Company and Surety (the "Obligations"), including but not limited to all renewals, extensions, and modifications thereof, and the due and punctual payment of the Obligations, interest thereon, and any other monies, costs, fees and expenses due or which may become due and punctual performance and observance by the Company of all of the other terms, covenants, and conditions of the Integrated Agreements and Obligations . . .

(October 26, 2005 Surety and Waiver to Praxis Capital, ¶ 1).

In response, Jerry Gardner responds that there is a question as to whether a valid contract ever existed due to a lack of consideration and fraud on the part of Praxis. Gardner states that in an effort to lure him into signing the Surety Agreement and the amended factoring agreements, Praxis told him that if he would sign the documents, then Praxis would not sign a criminal complaint against Jeremy Gardner. However, Jerry Gardner states that in fact, Praxis had already signed a complaint against his son and therefore, this was fraudulent inducement. In support of his argument, Gardner refers to Jeremy Gardner's Request for Admissions from Praxis[2] and also to Exhibits "A" and "B." Exhibit A is a letter dated October 20, 2005 from Praxis' President, Jay Starr, to Jerry Gardner. The letter states that if a number of conditions occur, including Jerry Gardner executing a revised Factoring document and executing a Personal Guaranty

---

[2] Jeremy and Jerry Gardner refer to and rely on the Requests for Admissions which they claim Praxis did not respond to and thus have admitted. However, it is clear that Praxis never received any such requests. Joe Jacobson, counsel for Praxis, states in response to Jerry Gardner's Motion for Sanctions that while Praxis did receive Requests for Production of Documents on or about December 12, 2006, they were not accompanied by any Requests for Admission. He details the procedure that his firm follows when discovery requests come into the office. Mr. Jacobson states that he does not recall receiving a set of 301 requests for admission and no response date was entered on his firm's central calendar. The request for production of documents however was listed in the central firm calendar. Additionally, on March 27, 2007, the Court entered an Order denying Jeremy Gardner's Motion for Sanctions related to this issue. Therefore, neither Jerry nor Jeremy Gardner may rely on any "admissions" from Praxis.

7

and Surety, guaranteeing the obligations of the Company to Praxis, then Praxis would not press criminal charges against Jeremy. However, Mr. Starr states in the letter:

> Please be advised that Praxis has been asked and has complied with the request of the District Attorney of Denver to submit a statement. Also, as Jeremy's counsel knows, it is possible that Praxis and its personnel may be asked to give statements or to testify in pending or future criminal cases against. [sic]. Praxis would comply with any such request.

(October 20, 2005 Letter from Starr to Jerry Gardner). Exhibit "B" is a Supporting Affidavit for an Arrest Warrant. The Affidavit indicates that on October 20, 2005, Jay Starr, President of Praxis filed a complaint regarding Jeremy Gardner.

"A party pleading breach of contract must show the making of a valid and enforceable contract, the right of one party and obligation of another under the contract, a violation or breach of the contract, and damages resulting from the breach." Associated Indemnity Corp. v. Small, No. 06-00187-CV-W-REL, *9 (W.D.Mo. Mar. 19, 2007). The Court finds that Praxis did not fraudulently induce Jerry Gardner into signing either the Surety Agreement or the Amended Factoring agreements. Mr. Star clearly states in his letter that he has given a statement to the Denver District Attorney. Whatever actions that the District Attorney decided to take on the basis of that statement is separate and apart from any actions of Praxis. Mr. Gardner entered into the Surety Agreement and then failed to comply with its provisions. Therefore, the Court finds that Praxis is entitled to Summary Judgment on Count II against Jerry Gardner.

**B. Count IV - Breach of Implied Covenant of Good Faith and Fair Dealing**

Praxis states that Missouri law implies a covenant of good faith and fair dealing in every contract and that this duty prevents one party from exercising a judgment conferred by the express terms of the agreement in such a manner that evades the spirit of the

8

transaction or denies the party the expected benefit of the contract. BJC Health System v. Columbia Casualty Co., 478 F.3d 908 (8th Cir. 2007). Under the Surety Agreement, Praxis states that Jerry Gardner committed himself to fulfill each and every obligation of Cutting Edge as delineated in the Factoring Agreement. However, Praxis states that he failed to perform these obligations and thus they are entitled to summary judgment on Count IV.

Jerry Gardner states in opposition that Praxis has failed to make specific accusations toward the defendant in their original pleadings that would support their claim that he defrauded Praxis into entering into and executing the Factoring Agreement and that he defrauded Praxis by submitting false invoices, contracts and customer contracts. He also states that Praxis has failed to state which assets he misappropriated. Mr. Gardner then again relies on the Request for Admissions and states that Praxis has admitted various statements. He also again states that he was fraudulently induced to enter into the contract and thus Praxis is prohibited from redress.

The Court finds that Praxis has very clearly and specifically alleged the facts supporting their claims as evidenced by the 113 paragraph Statement of Uncontroverted Facts. As noted above, Jerry Gardner may not rely on any Request for Admissions, because no requests were ever served on plaintiff. Finally, the Court has already dealt with the fraudulent inducement argument. Accordingly, the Court finds that Praxis is entitled to Summary Judgment on Count IV.

### C. Count V - Fraud

Praxis states that it is entitled to Summary Judgment on this Count against Jerry

9

and Jeremy Gardner because they intentionally and deliberately misrepresented information on their application from the beginning. The Gardners supplied Praxis with a false tax return, failed to reveal that Jeremy had been incarcerated for committing fraud in Colorado, and supplied false contracts and invoices to Praxis. Praxis states that the Gardners made multiple false and misleading statements with knowledge of their falsity and with the intent that Praxis would rely on these statements. Praxis had no knowledge of the falsity of these misrepresentations, but relied upon them in making its payment of funds under the Factoring Agreement.

In response the Gardners state that Praxis has failed to plead any specific acts of fraud with specificity, that there is no proof of the tax return, Gerald Gardner was unaware of the investigation against his son, Praxis failed to provide evidence of contracts and invoices and failed to provide evidence of checks or wire transfers showing that over a million dollars had been advanced to Cutting Edge.

The Court disagrees and finds that Praxis has supplied ample authority demonstrating that both Jerry and Jeremy committed fraud. The elements of a submissible case of fraud/intentional misrepresentation are:

> 1) a false material misrepresentation; 2) the speaker's knowledge of its falsity or his/her ignorance of the truth; 3) the speaker's intent that his/her representation should be acted upon by the hearer in the manner reasonably contemplated; 4) the hearer's ignorance of the falsity of the representation; 5) the hearer's reliance on the representation being true; 6) the hearer's right to rely thereon; and 7) the hearer's consequent and proximately-caused injuries.

BMK Corporation v. Clayton Corp., No. ED 87110, 2007 WL 1597746, *9 (Mo.App. June 5, 2007) (quoting Murray v. Crank, 945 S.W.2d 28, 31 (Mo.App. 1997)).

The sixty-six paragraph declaration of Jay Starr goes into very specific detail regarding what representations and statements were made to Praxis and then

describes how Praxis learned that the information and statements were false. Praxis also supplied additional Affidavits from other company officials in support of their motion. Praxis also provided copies of invoices that Cutting Edge sent to various customers. The Court finds that Praxis has provided ample evidence of the facts supporting its claim that Jerry and Jeremy defrauded it. Accordingly, the Court finds that Praxis is entitled to Summary Judgment on Count V.

### D. Count VI - Intentional Interference with Contractual Relations

Under Missouri law, a claim for tortious interference with a contract and tortious interference with a future business expectancy requires: "(1) a contract or valid business expectancy; (2) Defendant's knowledge of the contract or relationship; (3) Intentional interference by the defendant inducing or causing breach of the contract or relationship; (4) Absence of justification; and (5) Damages resulting from the defendant's conduct." Community Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n., 796 S.W.2d 369, 372 (Mo. banc 1990). Praxis states that it had a contract and valid business expectancy based on the Factoring Agreement entered into with Cutting Edge. Defendants each knew of this relationship, yet they set about to interfere with this relationship by improper means including but not limited to wire and mail fraud, theft and conversion. Praxis states that the defendants supplied several documents which were designed to mislead Praxis into transferring funds to them through the submission of false invoices and contracts. Praxis argues there is no justification for these actions and they are entitled to judgment on this count.

In response, defendants argue that Praxis has failed to provide any evidence that they provided misleading documents, false invoices or false contracts. Defendants state that they requested copies of these documents, invoices and contracts but Praxis

failed to respond or file timely objections.

However, as previously discussed, Praxis provided copies of all of the documents, invoices and contracts in the exhibits attached to their motion for summary judgment. Additionally, as was discussed in the Order ruling on the Motion for Sanctions, Praxis' responses to defendants' Request for Production of Documents were originally sent to the wrong address. However, after learning that Jeremy Gardner had been transferred to a different facility, the documents were resent to the correct address. Thus, defendants have no basis for claiming that they never received the documents on which Praxis relies. Accordingly, the Court finds that Praxis is entitled to summary judgment on Count VI.

### E. Counts VIII and IX - Misappropriation, Theft and Conversion

> In Missouri, conversion may be proved in one of three ways: firstly, by tortious taking; secondly, by any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to rights of the owner; or thirdly, refusal to give up possession to the owner on demand.

In re: Litzinger, 340 B.R. 897 (8th Cir. BAP 2006), citing Lacks v. R.Rowland & Co., Inc., 718 S.W.2d 513, 517 (Mo.App. 1986). In Gadberry v. Bird, 191 S.W.3d 673 (Mo. App. 2006), the Court stated:

> Money represented by a general or ordinary debt is not subject to a claim for conversion . . . As a general rule a claim for money may not be in conversion because conversion lies only for a specific chattel which has been wrongfully converted. . . . However, misappropriated funds placed in the custody of another for a definite purpose my be subject to a suit for conversion, when the plaintiff delivers funds to the defendant for a specific purpose, and the defendant diverts those funds to another, different purpose.

Id. at 675-76 (internal citations and quotations omitted).

Praxis states that in the instant case, the Gardners have converted assets to

12

their own use through fraudulent conduct. As a result, Praxis states that the defendants are depriving Praxis of the rightful and immediate possession of their property.

In response, the Gardners simply state that Praxis has failed to identify what "false information" the defendants supplied and have failed to show that the defendants misappropriated any funds. Defendants again claim that they did not receive any documents from Praxis in response to their Request for Production of Documents. However, as noted above, the Court has already considered and rejected this argument. The facts and the details regarding the funds which were misappropriated and converted are clearly spelled out in Plaintiff's Statement of Uncontroverted Facts. Additionally, the several hundred pages of exhibits attached to the Motion for Summary Judgment supply the necessary details. The Court finds that Praxis has shown that the Gardners misappropriated and converted their funds and therefore Praxis is entitled to summary judgment on Counts VIII and IX.

**F. Count XI - Conspiracy**

Praxis states that in Missouri a civil conspiracy is "an agreement or understanding between at least two persons to do an unlawful act, or to use unlawful means to do an act that would otherwise be lawful." Roth v. La Societe Anonyme Turbomeca France, 120 S.W.3d 764, 777-778 (Mo.App. 2003). Praxis states that Jeremy and Jerry Gardner acted in concert throughout the eight month relationship with Praxis to 1) defraud Praxis into entering and executing the Factoring Agreements; 2) misappropriating corporate assets; 3) interfering with defendant's ongoing business, including customer and employee relations; 4) misappropriating collateral pledged to Praxis by Cutting Edge and 5) interfering with Praxis' ongoing contractual relationship with Cutting Edge.

Again, in response, the Gardners state that Praxis has failed to make any specific accusations that they were defrauded or that the Gardners interfered with the defendants' ongoing business including customer and employee relations. The Gardners also allege that Praxis has failed to state which assets were removed. However, all of this detail is supplied in Praxis' 113 paragraph Statement of Uncontroverted Facts. The Gardners also refer to their Requests for Admissions from Praxis. However, as has been previously discussed, the Gardners never served any Requests for Admission on Praxis and therefore cannot rely on any supposed admissions in support of their arguments. The Court finds that Praxis has met its burden to show that Jeremy and Jerry Gardner conspired to defraud it and Praxis is therefore entitled to summary judgment on Count XI.

### G. Damages

In its Motion for Summary Judgment, Praxis asks that Judgment be entered on each Count in the sum of $1,144,500.88, together with interest and counsel fees. However, in the Declaration of John Neunson, Managing Director of Finance for Praxis, he states that the total amount outstanding is $ 1,144,500.88. The Court finds no reason to award this amount separately on each of the seven counts asserted against the Gardners. Additionally, the Court would note that plaintiff has filed a Motion for Entry of Consent Judgment against Cutting Edge Fabrication, LLC in the amount of $1,371,260.56. This amount comprises actual damages of $ 1,144,500.88, Attorney's Fees and Costs of $155,938.60 and Pre-Judgment interest of $70,821.08. To the extent that this amount covers the same loss as was sought against the Gardners, the damages are joint and several.

### H. Gerald Gardner's Motion for Summary Judgment

14

As the Court has entered summary judgment in favor of Praxis on all counts, the Court hereby **DENIES** Gerald Gardner's Motion for Summary Judgment (Doc. # 91).

**I. Gardners' Motions for Sanctions**

Both Jeremy and Gerald Gardner filed Objections to the Exhibits Utilized by Praxis in Support of its Motion for Summary Judgment and have also filed Objections to Praxis' Witness and Exhibit Disclosures. Additionally, the Gardners have moved for Sanctions based on these failures. The basis of these motions is that Praxis failed to provide the Gardners' with their Rule 26 disclosures. Based on Praxis' failure to disclose these exhibits, the Gardners state that they are precluded from using them to support their motion. The Gardners also state that they were precluded from conducting any discovery regarding these witnesses or exhibits.

In response, Praxis states that all of the exhibits attached to its Motion for Summary Judgment were supplied to the defendants at the same time the motion for summary judgment was filed. Most of these documents were either defendants' or Cutting Edge's own documents or were documents originally disclosed and produced by Praxis in its original filings. The majority of the witnesses were also identified in the Complaint.

The Court finds no basis on which to grant sanctions. Additionally, the Court would note that even if the Gardners' motions had merit, they were filed too late for the Court to act upon. The Scheduling and Trial Order specifically states that all discovery motions must be filed before the close of discovery, and in sufficient time for the Court to rule the motion. Discovery closed in this case on December 15, 2006. The Gardners' motions were not filed until March 19, 2007 and April 2, 2007. Thus, if the Gardners had a legitimate concern that they had not received the Rule 26 disclosures,

15

Case 6:06-cv-03043-FJG   Document 136   Filed 07/02/07   Page 15 of 16

they should have raised this before the close of discovery. Accordingly, the Court hereby **DENIES** the Gardner's Motions for Sanctions and Combined Objections (Docs. # 123, 124).

## IV. CONCLUSION

Accordingly, for the reasons stated above, the Court hereby **GRANTS** Praxis' Motion for Summary Judgment (Doc. # 89), **DENIES** Gerald Gardner's Motion for Summary Judgment (Doc. # 91), **GRANTS** Jeremy Gardner's Motion to Liberally Construe Pleadings and Motions (Doc. # 120); **GRANTS** Jeremy Gardner's Motion to Accept Pleadings and Motions as Timely Filed (Doc. # 121); **DENIES** Gerald Gardner's Motion for Sanctions (Doc. # 123); **DENIES** Gerald Gardner's Combined Objections to Plaintiff's Witness and Exhibit Disclosures and Motion for Sanctions Pursuant to Rule 37(c) (Doc. # 124); **DENIES as MOOT** Praxis' Motion in Limine (Doc. # 129) and **GRANTS** Motion to Withdraw as Attorney for Cutting Edge LLC (Doc. # 133).

Date: 7/2/07
Kansas City, Missouri

**S/ FERNANDO J. GAITAN, JR.**
Fernando J. Gaitan, Jr.
Chief United States District Judge